## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CEDRIC M. COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:15-cv-01019-SGC |
| | ) | |
| CITY OF IRONDALE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANUM OPINION

This is an employment discrimination case brought by the plaintiff, Cedric M. Coleman, against the City of Irondale. The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 10). Presently pending is the City's motion for summary judgment (Doc. 20), which is fully briefed and ripe for adjudication (Docs. 21-22). For the reasons that follow, the motion for summary judgment will be granted in its entirety.

## I.    FACTS

In December 2004, the City hired Coleman, who is black, as a rookie Police Officer. (Doc. 20-1 at 2). During the relevant time period, Jerry McIntosh was the City's Chief of Police ("Chief McIntosh"); Jason Wiggins and Paul Wiggins were Lieutenants; and Kyle Roberson ("Sgt. Roberson") was initially a fellow officer who was later promoted to be Coleman's shift supervisor. (Id.; Doc. 20-10 at 3).

For approximately one month, Coleman received on-the-job training by riding along with Officer Kennedy on patrols. (Doc. 20-1 at 2; Doc. 20-2 at 12). Coleman then attended the police academy for approximately three months; after successfully completing the police academy, Coleman trained on the job with Officer Ronnie Melton for four to six weeks. (Doc. 20-1 at 2; Doc. 20-2 at 11-12; *see* Doc. 21 at 3). Coleman testified his training with Melton included patrolling with him, responding to calls, and issuing citations. (Doc. 20-2 at 11, 13). Although he did not contemporaneously report any problems regarding his training, Coleman testified that Melton "didn't really do any training." (Doc. 20-2 at 13). Coleman notes that an unnamed white rookie officer hired three months after Coleman received training from Sgt. Roberson, who Coleman describes as a "highly regarded training officer." (Doc. 21 at 4).

Approximately a year after Coleman was hired, he received his first reprimand for a policy infraction for liability arising from interactions with intoxicated drivers; Coleman attended a class on the subject. (Doc. 20-1 at 3). Over the next seven years, Coleman received nineteen additional verbal and written reprimands for various violations, including: repeated failure to turn in paperwork, participate in legal proceedings, or attend hearings incident to citations, warrants, and arrests; repeated tardiness; absenteeism; releasing information to unauthorized persons; failure to report to training; failure to maintain his vehicle;

2

and failure to respond to a call for two and a half hours when he was at his residence during his shift. (*Id.* at 3-5). For the vast majority of these incidents, Coleman did not contest the City's findings and simply signed the reprimands. (Doc. 20-1 at 3). As discipline, Coleman received: (1) a one-day suspension without pay on November 9, 2006, for failing to complete a complaint and probable cause hearing within 48 hours, failing to verify a traffic citation, and failing to attend a trial on a speeding ticket for which he had been subpoenaed; (2) a thirty-day suspension from all off-duty employment on August 25, 2010, for failing to attend court, despite being subpoenaed, resulting in dismissal of the charges; and (3) a three-day suspension without pay on March 17, 2011, for failure to answer a dispatch call during the night shift. (Doc. 20-1 at 3-4, 6).

In response to the City's recitation of his employment disciplinary history, Coleman characterizes his 2006 infractions—regarding interactions with DUI suspects and failure to participate in a probable cause hearing—as training issues, rather than disciplinary issues. (Doc. 21 at 4). Coleman relies on his testimony that he received "no training" during the four to six weeks he spent accompanying Officer Melton after the police academy.[1]

---

[1] Coleman's brief also asserts disparate discipline, claiming "no white officers were ever 'written up' for similar infractions." (Doc. 21 at 4). However, because this assertion cites no evidentiary support, it will not be considered on summary judgment.

The City's police officers are required to submit monthly productivity reports quantifying traffic enforcement efforts, felony and misdemeanor arrests, accident reports, and issuance of warnings, parking tickets, and traffic citations. (Doc. 20-1 at 6). Officers submit the monthly productivity reports to supervisors for approval. (*Id.*). During 2012 and 2013, nine of Coleman's monthly productivity reports were disapproved by at least one supervisor. (*Id.* at 6). On December 4, 2013, Coleman met with Sgt. Roberson and Lt. Wiggins regarding his monthly reports, and Coleman was informed he would lose his off-duty job privileges if his productivity did not improve. (*Id.*).[2] Coleman testified that reports, showing similar productivity, submitted by Officer Hay, who is white, were accepted by supervisors. (Doc. 20-2 at 40). The City contends Officer Hay was more productive over time and had legitimate reasons for lower productivity months, such as being on vacation. (Doc. 20-1 at 6-7).

As to shift assignments, Officers request their desired shifts and days off in September of each year, and the City assigns shifts based on seniority. (*Id.* at 7). Although the parties' briefs do not include a timeline regarding Coleman's assigned

---

[2] Coleman's brief asserts that no white officers who were tardy or whose monthly productivity reports were disapproved were suspended from off-duty work or suspended without pay. (Doc. 21 at 5). This contention does not cite any evidence of record and will not be considered. However, even accepting this unsupported assertion regarding productivity reports, it is not probative, since Coleman's suspensions were unrelated to his monthly productivity reports. Similarly, Coleman's unsupported assertion that "[n]o white officers had to meet with Lieutenant Wiggins or were threatened with the loss of off-duty job privileges for 'productivity' issues" will not be considered on summary judgment. (*See id.*).

shifts, it appears he was initially assigned to a night shift before the City accepted his request to move to a day shift at some point. (Doc. 20-1 at 7). Coleman testified that after initially working a night shift for two to four years, he was transferred to the day shift. (Doc. 20-2 at 14-15).[3]

The City contends it issues new equipment based on a number of factors, including productivity, seniority, driving history, and officers' maintenance and care of their equipment. (Doc. 20-1 at 7). Vehicle assignment can change during the year based on the occurrence of "at fault accidents" and "maintenance issues." (*Id.*). From 2011 through his resignation, Coleman was assigned a 2005 Ford Crown Victoria. (*Id.*). In 2014, the City purchased a Chevrolet Tahoe and six new Dodge Chargers. (*Id.*). At some earlier point, the City purchased five 2006 Crown Victorias and three 2008 Crown Victorias. (*Id.*). The City contends Coleman was not assigned one of these newer vehicles because of maintenance issues with his assigned vehicle, lack of productivity, and "poor job performance generally." (*Id.* at 7-8). As to maintenance issues, the City notes that in March 2014, despite previous instructions to the contrary, Coleman's vehicle went 5,000 miles beyond its scheduled maintenance and the oil level to dropped to one quart. (*Id.* at 8). The City also notes that white officers with Coleman's level of seniority were not

_____

[3] In 2010, Coleman requested to be moved back to the midnight shift so that he could care for his children while his wife was working. (Doc. 20-4 at 5). It is unclear whether this request was granted and what shifts Coleman worked for the remainder of his tenure.

assigned new vehicles: (1) Officer Pauly was assigned to a 2005 Crown Victoria due to his driving history, before being reassigned to a 2008 Crown Victoria in 2014; and (2) Officer Hay was assigned to a 2005 Crown Victoria "due to lack of cleanliness." (*Id.*).[4]

The City's officers typically utilize laptop computers while on patrol. Coleman alleges he was denied access to a laptop for approximately one year and did not receive a laptop until he contacted his attorney in this matter. Relying on the affidavit of Sgt. Roberson, Coleman's shift supervisor, the City contends Coleman's computer was sent to be serviced in December 2013. (Doc. 20-1 at 8-9). The computer's return was delayed, first because "a new air card had to be ordered" and subsequently because the computer crashed and "could not be recovered." (*Id.*). Roberson averred that he "kept Coleman apprised of the process as it was ongoing." (Doc. 20-10 at 3). It is unclear when the laptop was returned to Coleman, but it was at some point after he hired an attorney. (Doc. 20-2 at 28). Emails attached to the affidavit support Roberson's version of events concerning the laptop maintenance. (Doc. 20-11 at 7-9). The City also notes that the time

---

[4] Coleman does not refute the facts offered by the City regarding vehicle assignments. Instead, without citing any evidence in support, Coleman states he "disputes the assertion that productivity, driver history, and care of current equipment are factors for the city issuing new equipment (police vehicles)." (Doc. 21 at 5). Coleman also claims, without citing any evidentiary support, that he led the midnight shift in DUI arrests and "led in productivity for several months but was never assigned a newer vehicle." (*Id.*). As with Coleman's other unsupported assertions, these naked allegations will not be considered on summary judgment.

during which Coleman's computer was unavailable coincided with a period when Coleman was restricted to light duty and, thus, not assigned to patrol. (Doc. 20-1 at 8-9; Doc. 20-2 at 28).[5] Accordingly, the City contends Coleman was not denied access to a laptop for use during patrol. (Doc. 20-1 at 8-9). Coleman does not dispute the City's version of events concerning his laptop. (*See generally* Doc. 21).

The Jefferson County Personnel Board handles hiring and advancement within the City's police department. (Doc. 20-1 at 9). When a position becomes available, the Chief requests a list of eligible candidates, which includes the candidates who have passed the Personnel Board's promotional exam. (*Id*.). The promotional exam, which is given every two to three years, determines each officer's eligibility for certain positions and ranks. (*Id.*). The City contends selection for open positions is based on job performance, leadership qualities, the Personnel Board's ranking, and employment history. (*Id.*).

Coleman contends he applied for a K-9 position in 2007; the position was awarded to Sgt. Roberson. Coleman acknowledged that Sgt. Roberson had more seniority but contends he should have gotten the position because he lived in Irondale, while Roberson lived outside the jurisdiction. (Doc. 20-1 at 9-10). In addition to noting that Coleman already had multiple violations by 2007—Sgt.

---

[5] During his deposition, Coleman testified that he was on light duty from the end of 2013 until just prior to his resignation. (Doc. 20-2 at 21).

Roberson had no violations at the time—the City also notes that Coleman lived in an apartment at the time, which is "not ideal for a K-9 position." (Doc. 20-1 at 10).

Coleman also alleges that Larry Fowler—a white officer with less seniority—received a detective position in 2008. The City notes that Fowler was a veteran of the Birmingham Police Department with experience performing the duties of a detective. (Doc. 20-1 at 10). The City also notes that Coleman never complained to anyone regarding Fowler's selection for the detective position in 2008. (*Id.*).[6]

In response to Coleman's allegations that he was denied training and educational opportunities, the City contends he: (1) had the same opportunities as all other officers; (2) was never denied any training; and (3) was granted every educational opportunity he requested. (Doc. 20-1 at 10). Coleman's testimony support's the City's contentions in this regard. (Doc. 20-2 at 28). In particular, the City notes that Coleman requested a modified schedule in 2013, so that he could attend classes at Virginia College. (Doc. 20-1 at 10-11). It is true that Lt. Wiggins initially denied Coleman's request because the City disfavored modified schedules for all officers. (*Id.* at 11). However, after Coleman met with the Chief, the City granted Coleman's request for a modified schedule. (*Id.*). Coleman does not

_____

[6] Coleman does not point to any evidence contradicting the City's version of events regarding the 2007 K-9 position or the 2008 detective position. Instead, without citing any evidence, Coleman contends he "was targeted for discipline by white supervisors" to justify denying the promotions. (Doc. 21 at 5-6). This unsupported assertion will not be considered on summary judgment.

contest the City's recitation of facts concerning training, educational opportunities, or his 2013 request for a modified schedule to accommodate his educational aspirations.

The City maintains policies and procedures regarding duty requirements, grievances, equipment, equal employment opportunities, and harassment. (Doc. 20-1 at 11). The harassment policy provides "the employee shall immediately notify his or her supervisor of the harassment, as soon as possible, so that steps may be taken to protect the employee from further harassment, and appropriate investigative and disciplinary measures may[ ]be initiated." (Doc. 20-1 at 11). Coleman received the policy when he was hired and was familiar with the grievance procedure. (*Id.*).

On May 9, 2014, Coleman met with the City's mayor and Chief McIntosh, where he complained about workplace harassment, including issuance of equipment, his patrol vehicle, and racially charged incidents, including: (1) a 2011 text message; and (2) a screensaver on a computer in the squad room. (Doc. 20-1 at 11). Regarding the text message, in 2011 Sgt. Roberson sent Coleman a message including the "N-word." (Doc. 20-1 at 12). Sgt. Roberson contended that he accidently included Coleman as a recipient of the message and contemporaneously apologized to Coleman when he realized his mistake. (*Id.*). The City contends Coleman did not file a grievance or report the text message until

the May 9, 2014 meeting. (*Id.*). In response, Coleman contends he did contemporaneously report the text message to Sgt. Meadows, who in turn reported it to Lt. Wiggins. (Doc. 21 at 6). On summary judgment, this factual dispute will be resolved in Coleman's favor. In any event, following the May 9, 2014 meeting, the City investigated the 2011 text message and sent Roberson to sensitivity training. (Doc. 20-1 at 12).

Regarding the screensaver, during the May 9, 2014 meeting Coleman complained about a computer in the squad room with a screensaver depicting a black man with an afro and the NBA logo, which had been manipulated to read "pimps, players and hustlers." (Doc. 20-1 at 12).[7] The timing of the screensaver's appearance is unclear, but it appears Coleman noticed it during the Spring of 2014;[8] the May 9, 2014 meeting was the first time Coleman mentioned it to anyone at the City. (*Id.*). Following the meeting, the City investigated the complaint, conducted training, and on June 13, 2017, issued a memorandum banning screensavers displaying images or messages of a political, personal, religious, sexual, or offensive nature. (*Id.*; Doc. 20-9 at 3). Coleman did not observe any additional inappropriate screensavers after the meeting. (Doc. 20-1 at 12-13; Doc.

---

[7] During his deposition, Coleman also testified that in 2012 or 2013 he found a screensaver depicting President Obama standing next to a vehicle with oversize rims. (*See* Doc. 20-1 at 12). Coleman does not dispute the City's contention that he never complained about this screensaver until he mentioned it in his EEOC charge.

[8] During his deposition, Coleman testified he noticed the NBA-themed screen saver shortly before his May 9, 2014 meeting with the mayor and Chief McIntosh. (Doc. 20-2 at 32).

20-2 at 32). Coleman does not contest the City's version of events surrounding any offensive screensaver.

On June 13, 2014, Coleman found a picture taped to the outside of his locker door. (Doc. 21 at 6). Coleman's locker was located with the other officers' lockers in the squad room where officers met at the beginning of shifts. (Doc. 20-2 at 34). Coleman immediately complained to the City, describing the picture as a photo of a black man with a noose around his neck. (Doc. 20-1 at 13). Lieutenant Kellogg immediately investigated, and on June 14, 2014, Officer Chip Arrington admitted to posting a photo of the 1980s-era professional wrestler, Junkyard Dog, on Coleman's locker. (*Id.*). Arrington stated that in February 2014, he posted photos of various professional wrestlers on various officers' lockers—including Coleman's—in an effort to "boost morale." (*Id.*). The photo depicts Junkyard Dog holding a chain attached to a dog collar on his neck, his signature attire in the ring. (*See id.*; Doc. 20-13 at 12). Coleman testified that although he noticed pictures of other wrestlers taped to other officers' lockers, he did not see the picture of Junkyard Dog on his locker until June 13, 2014, the day after his attorney wrote a letter to the City regarding racial discrimination and disparate treatment. (Doc. 20-2 at 34; *see* Doc. 21 at 6; Doc. 1-4). Coleman testified he never asked anyone why the photo was placed on his locker because he was scared. (Doc. 20-2 at 34-35). The Junkyard Dog photo was removed—as were the other photos of professional

wrestlers on other officers' lockers—when the City concluded its investigation. (Doc. 20-12 at 3). After the Junkyard Dog photo was removed, Coleman did not notice any other pictures on his locker.

June 12, 2014, Coleman's counsel wrote a letter to the City, summarizing Coleman's allegations of disparate treatment and a racial discrimination. (Doc. 1-4). On July 9, 2014, Coleman filed his EEOC charge, alleging retaliation and a racially hostile work environment. (Doc. 1-1). The EEOC charge: (1) alleged that almost immediately following his hiring in 2004, he was subjected to racially offensive conduct by white coworkers and supervisors; (2) described the offensive 2011 text message from Sgt. Roberson; and (3) alleged Coleman "was denied new equipment, favorable assignments, and opportunities to extend [his] education or advance within the department." (*Id.*). The EEOC charge also notes the May 9, 2014 meeting with the mayor and Chief McIntosh and alleges no actions were taken as a result. The charge further contends that following the meeting, Coleman noticed the offensive computer screensavers[9] and the photo of Junkyard Dog. (*Id.*). The EEOC issued a right to sue letter on March 18, 2015. (Doc. 1-2). On

Coleman resigned on September 12, 2014. (Doc. 21 at 6; Doc. 20-1 at 13). In his letter of resignation, Coleman stated he suffered from nearly ten years of psychological abuse and discrimination and he feared for his safety. (Doc. 20-1 at

---

[9] This allegation contradicts Coleman's testimony that he noticed the offensive screensavers before the May 9, 2014 meeting.

13).  During his deposition, Coleman testified the picture of Junkyard Dog was the incident that made him fear for his safety.  (*See id.*; *see also* Doc. 21 at 6).  On June 17, 2015, Coleman initiated the instant lawsuit.  (Doc. 1).  The complaint asserts claims under Title VII for constructive discharge, retaliatory hostile work environment, and retaliation.

## II.    COLEMAN'S NOTES

Before addressing the merits of the motion for summary judgment, the undersigned will address the City's objection to Coleman's reliance on excerpts of his journal to support his opposition.  (Doc. 22 at 2).  These handwritten journal excerpts were attached as an exhibit to Coleman's deposition and, thus, appear on the record in this matter.  (Doc. 20-4 at 18-39).  At his deposition, Coleman testified that he keeps a journal "[o]ff and on" and wrote the excerpts at issue sometime before he met with Chief McIntosh and the mayor; he testified he probably wrote the entries "around the beginning of [] 2014."  (Doc. 20-2 at 39).  Coleman has not responded to the City's objection or sought leave to file a sur-reply regarding reliance on the journal.

Coleman's response in opposition to the motion for summary judgment relies heavily on the journal.  Coleman cites the journal as the sole basis of support for the following assertions: (1) an unnamed white rookie officer, hired shortly after Coleman, was trained by Sgt. Roberson, "a highly regarded training officer;" (2) at

an unspecified time, a less-senior white rookie officer was assigned a newer patrol car than Coleman, despite being involved in numerous accidents; (3) this same white rookie officer's patrol car had a computer, while Coleman's did not; (4) unnamed white officers with less seniority were assigned new patrol cars; (5) at some unspecified point, Coleman was assigned to the "midnight shift;" (6) the City had an unwritten "two o'clock rule," meaning officers were discouraged from requesting back-up after 2:00 a.m.; and (7) Coleman was "written up" for unidentified minor infractions as retribution for failing to follow the  two o'clock rule.  (Doc. 21 at 4-5).

The City objects to Coleman's reliance on the journal excerpts, arguing they constitute inadmissible hearsay and fail to meet the standards of Rule 56 of the *Federal Rules of Civil Procedure*.  Rule 56 requires a party to support factual positions by:

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.

FED. R. CIV. P. 56(c)(1)(A).  The rule further provides a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).  Where a factual assertion is not properly supported under Rule 56(c), the court has discretion to consider the

fact undisputed, grant summary judgment, or "issue any other appropriate order." FED. R. CIV. P. 56(e).

The *Federal Rules of Evidence* define hearsay as an out of court statement offered to prove the truth of the matter asserted. FED. R. EVID. 801(c). The hearsay exceptions contained in Rule 801(d)(1) are inapplicable to the journal excerpts. *See* FED. R. EVID. 801(d). Neither does Coleman cite the journal as admissions of a party opponent, making the exceptions under Rule 801(d)(2) inapplicable.

To qualify as a present sense impression, a statement describing an event must be "made immediately after the declarant perceived it." FED. R. EVID. 803(1). Here, it is not clear precisely when Coleman wrote the entries; he testified it was probably in 2014, sometime before the May meeting with the mayor and Chief McIntosh. It is equally unclear when most of the events described in the journal occurred. Clearly, the 2014 journal was not created contemporaneously with Sgt. Roberson's training of the unidentified white rookie officer, which necessarily occurred sometime in 2005. Similarly, it is clear the journal's supposition that Coleman began to be written-up for minor infractions due to his violation of the two o'clock rule was not contemporaneous with any discipline he received in 2014; two of the three oral reprimands Coleman received in 2014 were for tardiness and failure to turn in citations in a timely fashion. Coleman had been repeatedly

reprimanded for this conduct beginning in 2007. Accordingly, these allegations do not fall under the exception for present sense impressions.

While Rule 803(3) creates a hearsay exception for statements revealing a declarant's then-existing state of mind, the undersigned is unaware of any cases holding the state of mind of the individual alleging discrimination is relevant. *See Jenks v. Naples Comm. Hosp., Inc.*, 829 F. Supp. 2d 1235, 1248 (M.D. Fla. 2011); *Godwin v. Wellstar Health Sys., Inc.*, No. 12-3752, 2016 WL 901294, at *2 (N.D. Ga. Mar. 3, 2016).

Finally, Rule 807 creates a residual exception to the hearsay rule, but the exception is "used very rarely, and only in exceptional circumstances, and it applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *Jenks*, 829 F. Supp. 2d at 1248 (internal quotation marks and alterations omitted) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1279 (11th Cir. 2009)); *see Godwin*, 2016 WL 901294 at *2. Here, Coleman's journal does not does not have the guarantees of exceptional trustworthiness required under the residual exception. The self-serving excerpt is undated and contains vague allegations of events that occurred over a ten year time frame. *See Godwin*, 2016 WL 901294; *Jenks,* 829 F. Supp. 2d at 1247–49; *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000) ("This court

has consistently held that conclusory allegations without specific supporting facts have no probative value.").

For all of the foregoing reasons, the City's objections to Coleman's reliance on the journal are **SUSTAINED**, and the allegations citing solely to the journal will not be considered on summary judgment.

## III.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). When considering a summary judgment motion, the court must view the evidence in the record in the light most favorable to the non-moving party.  *Hill v. Wal-Mart Stores, Inc.*, 510 F. App'x 810, 813 (11th Cir. 2013).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

## IV.  DISCUSSION

Coleman asserts claims for constructive discharge, retaliatory hostile work environment, and retaliation.  The claims are addressed in turn.

### A.  Constructive Discharge

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009).  A prima facie case for constructive discharge requires a plaintiff to show "working conditions were so intolerable that a reasonable person in [his] position would have been compelled to resign."  *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir. 1997) (punctuation marks omitted).  This is an objective inquiry.  *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1363 (11th Cir. 1994).  To show that working conditions were sufficiently intolerable to compel resignation, a plaintiff must show a greater severity or pervasiveness of harassment than would suffice to satisfy a hostile work environment claim "such that resignation is the only reasonable response."  *Bentley v. Baker,* 2013 WL 3106658, *2 (M.D. Ga. June 18, 2013) (citing *Bryant*, 575 F.3d at 1298).[10]  Moreover, a plaintiff cannot succeed in a claim for constructive discharge unless he had no objectively reasonable

---

[10]  Given the court's conclusion that the City is entitled to summary judgment on the issue of hostile work environment, Coleman's claim for constructive discharge necessarily fails.  (*See infra*, Sec. IV.C).

alternative to resigning. *See Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).

Given the severity of conduct required to support a claim of constructive discharge, it is unsurprising that a plaintiff asserting the claim must resign shortly after the employer's offensive conduct. *See Lamont v. City of Albany*, No. 12-0082, 2015 WL 93874 at *14 (M.D. Ga. Jan. 7, 2015) (granting summary judgment on claim of constructive discharge where "the lack of temporal proximity between the adverse actions alleged and her actual resignation support a finding that, though she may have been unhappy in her employment, the conditions of her employment were not so unbearable that a reasonable person in her position would have been compelled to resign"); *Johnson v. Wal-Mart Stores, Inc.*, 987 F. Supp. 1376, 1393 (M.D. Ala. 1997) (harassment occurring more than two months prior to resignation insufficiently temporally proximate to support constructive discharge); *Shealy v. City of Albany, Ga.,* 137 F. Supp. 2d 1359, 1369 (M.D. Ga. 2001) (denial of promotion more than two years prior to resignation did not support constructive discharge).

Coleman relies on the following events to support his claim for constructive discharge: (1) the 2011 text message from Sgt. Roberson containing a racially derogatory epithet; (2) the Junkyard Dog photo taped to his locker in June 2014, which Coleman describes as depicting a "black man dressed as a slave with the

chain-link noose tied around his neck"; (3) being "assigned to a poor training officer" in 2005; (4) non-selection for the K-9 position in 2007 and the detective position in 2008; (5) being passed over for a new patrol vehicle and other equipment in favor of white officers with less seniority; and (6) "being subjected to racially offensive computer screensavers." (Doc. 21 at 7).

Coleman resigned on September 12, 2014. Accordingly, there is insufficient temporal proximity between events that occurred years earlier to establish that a reasonable person would be compelled to quit as a result. Coleman's allegedly inadequate training in 2005, non-selection for positions in 2007 and 2008, and the 2011 text message are too temporally remote to support a claim of constructive discharge in September 2014. The same rationale applies to the screensaver depicting President Obama, which Coleman noticed in 2012 or 2013. Regarding the photo of Junkyard Dog, accepting Coleman's testimony that he did not notice the photo on his locker until June 13, 2014—approximately four months after Officer Arrington placed it there and the day after Coleman's counsel sent a letter to the City—it is undisputed that the City removed the photo within days, as soon as its investigation was complete. Accordingly, the photo of Junk Yard Dog is too temporally remote from Coleman's resignation—which occurred three months later—to support a claim for constructive discharge. The same is true regarding the NBA-themed screensaver, which Coleman mentioned at the May 9, 2014

meeting with the mayor and Chief McIntosh and the City removed. This event occurred nearly four months prior to Coleman's resignation and is insufficiently proximate to support a claim for constructive discharge. Accordingly, the only events with sufficient temporal proximity to Coleman's resignation are his complaints regarding assignment of vehicles and equipment.

As to vehicle assignments, Coleman was assigned a 2005 Crown Victoria from 2011 until his resignation. Because the City acquired new vehicles in 2014 but did not assign one to Coleman, this action could be sufficiently close in time to support a claim of constructive discharge. However, denial of a new vehicle is not an adverse employment action that could support a claim for constructive discharge here. *See Brantley v. City of Macon*, 390 F. Supp. 2d 1314, 1329 (M.D. Ga. 2005) (provision of inferior equipment to plaintiff's crew did not affect the plaintiff's job performance and she "was never stripped of authority and was never subjected or threatened with demotion or loss of status in the workplace"). A reasonable person would not feel compelled to resign due to denial of a new vehicle, especially where a working vehicle was assigned.[11] *See Garner v. Wal-Mart Stores, Inc.,* 807 F.2d 1536, 1539 (11th Cir. 1987) ("Part of an employee's

---

[11] The burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) does not apply to constructive discharge claims. *See Davis v. Dunn Const. Co., Inc.*, 872 F. Supp. 2d 1291, 1308 (N.D. Ala. 2012). However, it is worth noting that Coleman has not rebutted any of the City's legitimate reasons for refusing to assign him a new vehicle or refuted the City's contention that white officers with similar levels of seniority were also denied new vehicles.

obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."

To the extent Coleman relies on the lack of a laptop computer in his patrol vehicle, he did not have access to a laptop from December 2013 until sometime in 2014. The City notes that Coleman's laptop was initially removed from his patrol car to receive maintenance, the computer subsequently crashed, and a new computer had to be ordered. Roberson provided updates regarding the computer to Coleman, and Coleman never complained to a supervisor about its absence until his May 2014 meeting with the Mayor and Chief of Police. For at least a majority of the time during which Coleman did not have a laptop computer, he was assigned to light duty and was not patrolling in his vehicle. Coleman does not refute the City's version of events concerning his computer. (*See generally* Doc. 21). In light of these undisputed facts, the absence of a computer does not constitute an adverse employment action. Accordingly, as a matter of law, a reasonable person would not have felt compelled to resign as a result of the unavailability of a laptop computer. *See Garner,* 807 F.2d at 1539.

For the foregoing reasons, under the undisputed facts of this case, a reasonable person would not have been forced to resign due to the denial of a newer vehicle or a laptop in a patrol vehicle. Accordingly, there are no genuine

issues of material fact concerning Coleman's claim for constructive discharge and the City is entitled to judgment as a matter of law on this claim.

### B. <u>Retaliation</u>

To make a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) a causal connection between the two. *Thomas v. Cooper Lightning, Inc.,* 506 F.3d 1361, 1363 (11th Cir. 2007). As to the second requirement, a plaintiff must show a reasonable employee would have found the employment action to be "materially adverse," meaning it would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). As to the causal connection, a plaintiff must show his "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). The causal connection may be shown by temporal proximity, but a plaintiff taking this route must show the events occurred "very close" in time. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Obviously, no causal connection exists where the adverse employment action occurs prior to the employee's protected activity. *E.g. Weaver v. Fla. Power & Light*, 1996 WL 479117 at *15 (S.D. Fla. July 16, 1996).

Here, Coleman characterizes two events as adverse employment actions: (1) the display of racially insensitive computer screensavers; and (2) the photo of Junkyard Dog taped to Coleman's locker.  (Doc. 21 at 12).  As to protected activity, Coleman does not specify the activity on which his retaliation claims rely. However, other portions of Coleman's opposition note that he engaged in statutorily protected expression: (1) in 2011, when he complained to Sergeant Meadows about the offensive text message; (2) in 2012 when he complained to Lieutenant Wiggins and Chief McIntosh about accommodating work hours and issuance of equipment; and (3) on June 12, 2014, when his attorney wrote a letter to the City regarding racial discrimination.  (Doc. 21 at 9).  Additionally, while Coleman does not cite it as an instance of protected activity, it is undisputed that Coleman complained to the City of racial discrimination during the May 9, 2014 meeting with the mayor and Chief of Police.  *See Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir.1989) (internal complaints of discrimination are statutorily protected conduct).

To the extent Coleman relies on the appearance of the racially insensitive screensavers to show retaliation, his attempts fail.  Regarding the screensaver depicting President Obama standing next to a car with oversized rims, Coleman testified the screensaver appeared in 2012 or 2013.  (*See* Doc. 20-1 at 12). Coleman does not dispute that he never complained about the screensaver until he

noted it in his June 9, 2014 EEOC charge. However, to be actionable, claims must arise within 180 days prior to filing an EEOC charge. 42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005). Accordingly, any retaliation claim based on the screensaver featuring President Obama is time-barred. As to the NBA-themed screensaver, all of Coleman's contemporaneous protected activity—the May 9, 2014 meeting, the June 9, 2014 EEOC charge, and the June 12, 2014 letter from his lawyer—occurred *after* the NBA-themed screensaver appeared. Accordingly, as a matter of law, the NBA-themed screensaver does not constitute retaliation.

As to the photo of Junkyard Dog, Coleman testified he first noticed it on June 13, 2014, the day after his attorney sent the letter to the City alleging racial discrimination. The photo depicts Junkyard Dog holding a chain attached to a dog collar on his neck. (Doc. 20-1 at 13; Doc. 20-13 at 12). After Coleman complained, the photo of Junkyard Dog was removed, as were the photos of other professional wrestlers taped to other officers' lockers. (*Id.*). This is sufficiently close in time to both the letter from Coleman's counsel and Coleman's May 9, 2014 meeting to establish causation. However, as explained below, the posting of Junkyard Dog's photo is not an adverse employment action.

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *White*, 548 U.S. at 67. The

acts must be "material and significant and not trivial." *Ekokotu v. Fed. Exp. Corp.*, 408 F. App'x 331, 337 (11th Cir. 2011). Here, it is undisputed that: (1) Coleman's co-worker taped a picture of Junkyard Dog, a black professional wrestler, to Coleman's locker; (2) the photo depticted Junkyard Dog in his signature in-ring apparel, including a dog collar and chain; (3) the co-worker affixed pictures of other professional wrestlers to other officers' lockers; (4) after Coleman complained, the City promptly investigated; (4) following the investigation, the City removed the photo of Junkyard Dog and the other professional wrestlers; and (5) no other photos appeared on Coleman's locker. Under these circumstances, a reasonable employee would not find that a co-worker's act of taping a picture of a professional wrestler to their locker to be a "materially adverse" employment action. *White*, 548 U.S. at 68; *see also Williams v. Russell Corp*. 218 F. Supp. 2d 1283, 1293-94 (M.D. Ala. 2002) ("As Eleventh Circuit precedent has established, [Plaintiff's] subjective feelings about [Defendant's] response to her complaint are immaterial and, where that response eliminated the conduct about which she complained, the response was reasonable."). Even if arguments relying on the screensavers did not fail for independently sufficient reasons, any retaliation claim based on the screensavers would fail under the same rationale.

For the foregoing reasons, there are no genuine issues of material fact concerning Coleman's claims for retaliation, and the City is entitled to judgment as a matter of law on these claims.

### C.    <u>Racial Discrimination – Retaliatory Hostile Work Environment</u>

Title VII of the Civil Rights Act prohibits employers, including government employers, from discriminating in the workplace on the basis of a person's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). The Eleventh Circuit "recognizes a cause of action for retaliatory hostile work environment." *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). To rise to the level of an adverse employment action, the retaliatory harassment a plaintiff suffered must be "sufficiently severe or pervasive to alter the terms and conditions of employment." *Id.* at 1311. "A prima facie case of retaliatory hostile work environment, like a prima facie case of retaliation generally, requires the establishment of protected activity." *Wheatfall v. Bd. of Regents of Univ. Sys. of Ga.*, 9 F. Supp. 3d 1342, 1359 (N.D. Ga. 2014) (citing *Gowski*, 682 F.3d at 1311).

Title VII prohibits a hostile work environment in which "a series of separate acts [ ] collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e–5(e)(1)). To establish a hostile work environment claim, a plaintiff must show: (1) membership in a protected group; (2) unwelcome harassment; (3) the harassment

was based on a protected characteristic of Plaintiff; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for the discriminatory environment under either vicarious or direct liability. *McCann v. Tillman,* 526 F.3d 1370, 1378 (11th Cir. 2008) (citations omitted). Evaluating whether harassment was sufficiently severe or pervasive involves objective and subjective components. *Id.* Regarding the objective component, courts examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted). A hostile work environment is one that "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rojas v. Fla.,* 285 F.3d 1339, 1344 (11th Cir. 2002) (citations omitted).

As an initial matter, Coleman's retaliatory hostile work environment claim suffers from the same flaw fatal to his other retaliation claims; there is no causal connection between any allegedly adverse employment action and Coleman's protected activities. (*See supra*, Sec. IV. B.). Coleman argues that, because he

alleges a hostile work environment claim, the court can consider events that occurred outside the statutory time period. (Doc. 21 at 11) (citing *Morgan*, 536 U.S. at 117). Coleman's point is taken, but because he alleges a retaliatory hostile work environment, he must show a causal connection between his protected activities and the discriminatory environment. *See Perkins v. Lynch*, 169 F. Supp. 3d 1246, 1252-54 (N.D. Ala. 2016). Additionally, as explained below, even if all of Coleman's allegations in support of this claim are accepted as true, they would fail to establish a hostile work environment as a matter of law.

In opposition to the City's motion for summary judgment on his retaliatory hostile work environment claim, Coleman relies on the following allegations: (1) denial of a take-home vehicle; (2) denial of requests to adjust his work schedule to accommodate educational needs; (3) denial of equipment; (4) denial of a newer vehicle; (5) exposure to offensive comments during roll-call; (6) exposure to offensive screensavers; and (7) the Junkyard Dog photo. (Doc. 21 at 10-11).[12]

It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 809 (11th Cir. 2010) (en banc). Therefore, only conduct that is "based on" a protected category, such as race, may be considered in a hostile work

---

[12] As with the claim for constructive discharge, the *McDonnell Douglas* burden-shifting analysis does not apply to hostile work environment claims. *See Davis*, 872 F. Supp. 2d at 1308. However, it is worth noting that Coleman has not rebutted any of the City's legitimate reasons for the first four decisions listed above regarding the City's denial of equipment and Coleman's various requests.

environment analysis. *See Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 584 (11th Cir. 2000), *abrogated on other grounds by White,* 548 U.S. 53. "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Id.* at 583; *see also Baldwin v. Blue Cross/Blue Shield of Ala.,* 480 F.3d 1287, 1301-02 (11th Cir. 2007) ("Title VII prohibits discrimination, including harassment that discriminates based on a protected category . . . ."). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998).

Coleman has not presented any evidence that denial of a take-home vehicle, denial of requests to adjust his work schedule to accommodate educational needs, denial of equipment, or denial of a newer vehicle were based on his race. Additionally, Coleman's opposition offers no facts concerning the offensive comments he heard during roll-call. Although the court is not obligated to scour uncited portions of the record, review of Coleman's deposition testimony reveals he found it offensive that, following President Obama's election, "[p]olitical views were openly expressed, especially negative comments when it came to Barack Obama." (Doc. 20-2 at 46). There is nothing inherently discriminatory about expressing political views or negative opinions of politicians. Accordingly, none

of the foregoing events will be considered in evaluating the presence of a hostile work environment.

Liberally construed, Coleman's allegations concerning the screensavers and the photo of Junkyard Dog could be construed as involving a racial component. The screensaver depicting President Obama appeared in 2012 or 2013. (*See* Doc. 20-1 at 12). Coleman did not complain about the screensaver until his June 9, 2014 EEOC complaint. The NBA-themed screensaver appeared in the Spring of 2014, and Coleman first complained about it during the May 9, 2014 meeting. Following the meeting, the City investigated the complaint, conducted training, and issued a memorandum banning potentially offensive screensavers. Coleman did not observe any additional inappropriate screensavers after this remedial action. Coleman noticed the photo of Junkyard Dog on June 13, 2014. Coleman complained, the City investigated, and the photo was removed, as were the photos of other professional wrestlers taped to other officers' lockers.

Applying the law regarding hostile work environment to these facts, Coleman cannot show that this conduct was objectively severe and pervasive. He complains of three discreet events occurring over two to three years. *E.g. Buckhanon v. Huff & Assocs. Const. Co., Inc.,* 506 F. Supp. 2d 958, 966 ("Three instances of derogatory language in a two month period does not rise to the level of frequency found actionable in Eleventh Circuit precedent."); *Mack v. ST Mobile*

*Aerospace Eng'g, Inc.,* 195 F. App'x 829, 838 (11th Cir. 2006) ("there is 'not simply some magic number of racial or ethnic insults' that preclude summary judgment, but rather 'it is repeated incidents of . . . harassment that continue despite the employee's objections that are indicative of a hostile work environment'") (alteration incorporated) (quoting *Miller v. Kenworth of Dothan,* 277 F.3d 1269, 1276 (11th Cir. 2002)). Viewed objectively, the display of two offensive screensavers and a photo of a professional wrestler were neither objectively humiliating nor physically threatening. *See Buckhanon,* 506 F. Supp. 2d at 966-67 (court cannot assume that offensive utterance "automatically denotes humiliation and threat"). Objectively, these displays were mere offensive utterances. *See id.* These circumstances would not unreasonably interfere with a reasonable employee's work performance. *See id.*; *Green v. City of Northport*, No. 11-2354-SLB, 2014 WL 1338108, at *13–20 (N.D. Ala. Mar. 31, 2014), *aff'd sub nom. Green v. Northport*, 599 F. App'x 894 (11th Cir. 2015). As a matter of law, even when taking all facts in the light most favorable to the non-movant, Coleman cannot show his work environment was "permeated with discriminatory intimidation, ridicule, and insult" or that the City created an "abusive working environment." *See Rojas,* 285 F.3d at 1344.

Additionally, Coleman only complained to the City about the NBA-themed screensaver and the photo of Junkyard Dog. The undisputed facts establish that the

City's response in both cases was swift and effective; the offensive displays were promptly removed and did not reappear. *Williams,* 218 F. Supp. 2d at 1293-94 (employer's prompt remedial action regarding a co-worker's harassment was appropriate response).

For the foregoing, independently-sufficient reasons, there are no genuine issues of material fact regarding Coleman's claim for retaliatory hostile work environment, and the City is entitled to judgment as a matter of law on this claim.

## V. CONCLUSION

For all of the foregoing reasons, there are no genuine issues of material fact concerning any of Coleman's claims and the City is entitled to judgment as a matter of law. Accordingly, the City's motion for summary judgment (Doc. 20) will be granted in its entirety, and all claims will be dismissed with prejudice.

A separate order will be entered.

**DONE** this 15th day of September, 2017.

*Staci G. Cornelius*

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE